No. 13,764.

JOHNSON, GOVERNOR ET AL. *v.* McDONALD.
(49 P. [2d] 1017)

Decided September 9, 1935. Rehearing denied October 7, 1935.

326

Mr. PAUL P. PROSSER, Attorney General, Mr. CHARLES ROACH, First Assistant, Mr. PIERPONT FULLER, Jr., Assistant, Messrs. DINES & HOLME, of counsel, for plaintiffs in error.

Mr. FRAZER ARNOLD, for defendant in error.

*En Banc.*

MR. JUSTICE YOUNG delivered the opinion of the court.

THIS is an action brought by the defendant in error against the plaintiffs in error in the district court in and for the City and County of Denver to enjoin the plaintiffs in error from carrying out the provisions of chapter

181, Session Laws, 1935, approved March 7, 1935, which together with chapter 124, Session Laws, 1935, approved April 4, 1935, was enacted to provide ways and means whereby the state of Colorado might procure from the Federal Government an advance of not to exceed $25,000,-000 to be used during the present financial depression for the construction, supervision and maintenance of public highways within the state of Colorado. The parties appear in the reverse order of their appearance in the trial court and for convenience will be herein designated as plaintiff and defendants. A general demurrer to the complaint was overruled in the district court, defendants elected to stand thereon, judgment was entered against them, and an injunction granted as prayed. Defendants bring the cause here on writ of error to reverse that judgment.

Chapter 124, Session Laws, 1935, purporting to ''amend sections 1385 to 1418, both inclusive'' of Compiled Laws of 1921, but in fact amending only sections 1391, 1409, 1410, 1411, 1413 and 1416 thereof, creates a state institution under section 1, article VIII of the Constitution (*State ex rel. Blakeslee v. Clausen,* 85 Wash. 260, 148 Pac. 28 [Syl. §6.]), a body corporate with power to adopt a common seal, to be known as the State Highway Department. This highway department is given the authority to exercise all powers given it from time to time by law, among which are the powers to lay out, construct, maintain and supervise the state highways. The act creates two separate funds, one to be known as the state highway fund and the other to be known as the state highway supplementary fund, and provides that all moneys paid into either fund shall be immediately available without further appropriation for the purposes for which such fund was created, as provided by law; it authorizes payments from the fund by the state treasurer on warrants drawn as provided by law; and further provides that nothing in the act shall alter the manner of

the execution and issuance of highway anticipation warrants as provided in chapter 181, supra.

Sections 3, 4, 5 and 6 of said chapter 124, being amended sections 1410, 1411, 1413 and 1416 of the Compiled Laws of 1921, are as follows:

"Section 1410. (a) All receipts from the following sources shall be paid into and credited to the State Highway Fund as soon as received:

"(1) From such appropriation as may, from time to time, be made by law to the State Highway Fund from excise tax revenues.

"(2) From all revenue accruing to the State Highway Fund under the provisions of law, by way of excise taxation from the imposition of any license, registration fee, or other charge with respect to the operation of any motor vehicle upon any public highways in this State, and the proceeds from the imposition of any excise tax on gasoline or other liquid motor fuel.

"(b) All receipts from the following sources shall be paid into and credited to the State Highway Supplementary Fund as soon as received:

"(1) From such appropriations as may from time to time be made by law to the State Highway Supplementary Fund.

"(2) From all moneys now in or that may hereafter be paid into the Internal Improvement Permanent Fund and the Internal Improvement Income Fund.

"(3) From all receipts from the sale of bonds that may be authorized by the people of the State for State Highway purposes.

"(4) From the Federal Government or any department thereof of moneys for the purpose of constructing, improving or maintaining State Highways, and from all public donations for such purpose. All such donations shall be paid to the credit of the State Highway Supplementary Fund for such particular purpose as may be indicated by the donor; Provided, However, that the

State Treasurer shall not receive any gift for such purpose without the approval of the Board.

"(5) From all moneys for State Highway purposes from sources other than those specified in Subdivision (a) of this Section.

"(c) All moneys in the State Highway Fund as heretofore constituted by Section 1409 of the Compiled Laws of Colorado, 1921, shall be covered into the State Highway Supplementary Fund on the date this Act goes into effect.

"The Highway Department hereby created shall be deemed to have assumed all lawful financial obligations of the State Highway Commission, created by Ch. 78, Session Laws of 1917, approved April 20, 1917."

"Section 1411. The State Highway Fund shall be available first for the creation and maintenance of the Highway Anticipation Fund or the Sinking Fund provided for in that certain Act entitled:

" 'An act to secure benefits for the people of Colorado under Federal legislation relating to public works and construction projects; to provide for receiving, on behalf of the state of Colorado, grants and advances from the Federal Government on projects for the construction, improvement, reconstruction and maintenance of public highways and bridges, for the expenditure of same; providing for the issuance of state highway fund revenue anticipation warrants and for their retirement by annual payments from highway funds. Approved March 7, 1935.'

"All moneys in the State Highway Fund, not required for the creation, maintenance and application of such Highway Anticipation Fund or Sinking Fund, shall with the State Highway Supplementary Fund be available to pay for:

"(1) All salaries, wages and necessary traveling and other expenses of all persons connected with the State Highway Department.

"(2) All equipment, furniture and supplies for offices,

division offices and laboratories as may be established by the Highway Engineer.

"(3) All incidental office expenses, including telegraph, telephone, postal, express charges and expenses for printing, stationery and advertising and for the publication of the quarterly bulletin.

"(4) All machines, tools or other equipment necessary for the furtherance of the work of the Department, and also land and buildings for the housing and use of the same.

"(5) The construction and maintenance of state highways.

"(6) All land damages incurred by reason of establishing, opening, altering, re-locating, widening, or abandoning portions of any state highway."

"Section 1413. The State Highway Fund and the State Highway Supplementary Fund shall be expended by the State Highway Department, subject to the following provisions: There shall be prepared a budget which shall show the amount of the State Highway Fund and the amount of the State Highway Supplementary Fund on hand, the amount of outstanding obligations against each fund, the estimated amount of receipts from all sources that will become available for each fund during the ensuing year, and the estimated amount to be expended for the various activities and projects for the forthcoming year. The total estimated expenditures contemplated for all purposes of the State Highway Department for a given year shall not exceed the total estimated available funds. It shall be the duty of the State Treasurer and the Highway Engineer to give, on request, such information as the Highway Advisory Board may need for the preparation of such budget. The budget shall be so prepared that it may be readily understood how much it is proposed to expend for administrative purposes, which shall not exceed four per cent of the estimated funds available—how much for construction, with an allowance of not more than ten per cent of the amount

to be expended on any construction work for engineering and supervision of the same; in general where such construction is to be located, how much for maintenance and the extent of highway it is proposed to maintain, together with such other essential facts as the Board may deem necessary in order that the people of the State may have full knowledge as to how much money there may be available in a given year for the work of the Department and how it is proposed to spend the money. In adjusting the expenditures for a given year, the Board shall give full consideration to the recommendation of the Chairman of the Boards of County Commissioners, of all the counties of the State of Colorado, who shall submit to the Board the necessary reports and recommendations, on or before the fifteenth day of November of each year. The budget in its final form so prepared, shall be issued in printed form and sent free of charge to any citizen of the State who may apply for the same.''

''Section 1416. If, as the result of any agreement made by the State Highway Department, on behalf of the State, and any branch of the Federal Government, there shall be undertaken actual construction or improvement of highways in the State, the letting of contracts, preparation and approval of specifications and plans, together with supervision of construction, shall on behalf of the State, be under the direct control of the State Highway Engineer, subject to the terms of the agreement so made, provided that no agreement or contract shall be made which shall require the expenditure of funds greater than that included in the budget for the current fiscal year plus additional advances from the Federal Government made after the date of the budget.''

The legislature declared the act necessary for the immediate preservation of the public peace, health and safety; that an emergency existed, and that it should take effect and be in force from and after its passage.

Plaintiff attacks the constitutionality of the act on nine grounds, which, after some general observations,

332

will be separately considered, though not in the order presented.

In construing our state Constitution, it is to be borne in mind that it is a self-imposed limitation by the people on their power to act, and that except as such power is inhibited or restricted by the Federal Constitution or is clearly limited or inhibited by the state Constitution, it is plenary. The power in the people is a residual power, a power remaining after the delegation of powers to the Federal Government, and this residual power is full and complete except for self-imposed limitations contained in the state Constitution. *Parsons v. People,* 32 Colo. 221, 76 Pac. 666; *People v. Ames,* 24 Colo. 422, 51 Pac. 426.

Our determination of this cause will be less difficult, if at the threshold of our consideration, we bear in mind the foregoing conception of the nature of our state Constitution, and if we further bear in mind that the function of courts in passing upon the constitutionality of legislative acts is to determine whether the Constitution inhibits or limits the power sought to be exercised thereby, rather than to determine the wisdom or policy of the acts. Courts are concerned with questions of the power of the legislature to act, but not with the policy it pursues within its powers. The determination of legislative policy within its powers is the prerogative of the legislature solely. This principle of law is well expressed in *Commonwealth ex rel. v. Reeder,* 171 Pa. 505, 513, 33 Atl. 67, 33 L. R. A. 141, quoted with approval in *Tranter v. Allegheny County Authority,* 316 Pa. 65 (173 Atl. 289), at page 75: "Whatever the people have not, by their constitution, restrained themselves from doing, they, through their representatives in the legislature, may do. This latter body represents their will just as completely as a constitutional convention, in all matters left open by the written constitution. Certain grants of power, very specifically set forth, were made by the state to the United States, and these cannot be

revoked or disregarded by state legislation; then come the specific restraints imposed by our own constitution upon our own legislature; these must be respected; but in that wide domain not included in either of these boundaries the right of the people through the legislature to enact such laws as they choose, is absolute. Of the use the people may make of this unrestrained power, it is not the business of the courts to inquire. We peruse the expressions of their will in the statute; then examine the constitution and ascertain if this instrument says, 'Thou shalt not,' and if we find no inhibition, then the statute is the law, simply because it is the will of the people and not because it is wise or unwise.''

Considering the two acts attacked in this action, we think it clearly appears that their primary objective is to make available for the construction, supervision and maintenance of public highways in Colorado, a large amount of funds offered as an advance by the Federal Government, and to attain this objective by authorizing the Highway Department to enter into a specific contract with the Federal Government, the terms of which are clearly set forth in chapter 181, supra. If this is the objective, and there can be no doubt that it is, then the whole matter will be determined by correctly answering the question, ''Has the state the power to authorize the making of such a contract?''

The plaintiff presents nine different constitutional grounds which he contends require a negative answer to this question. If any one of his contentions is sound he must prevail. Only in case none of them are sound, can the defendants prevail. Holding as we do that none of them present valid reasons for holding the acts unconstitutional, it is necessary that we consider all of them in order that the principles of law upon which we base our decision shall be manifest.

█ It is contended that ''Said Act [Chapter 181, supra] by its terms provides for the creation of a debt of the State of Colorado in excess of and in violation of

the limitations imposed by section 3 and section 4 of article XI of the Colorado Constitution.'' Said sections 3 and 4 so far as here material are as follows:

''Sec. 3. Public debt — Limit — Refunding bonds — Highway bonds. The state shall not contract any debt by loan in any form, except to provide for casual deficiencies of revenue, erect public buildings for the use of the state, suppress insurrection, defend the state, or, in time of war, assist in defending the United States; and the amount of debt contracted in any one year to provide for deficiencies of revenue, shall not exceed one-fourth of a mill on each dollar of valuation of taxable property within the state, and the aggregate amount of such debt shall not any time exceed three-fourths of a mill on each dollar of said valuation, until the valuation shall equal one hundred millions of dollars, and thereafter such debt shall not exceed one hundred thousand dollars; and the debt incurred in any one year for erection of public buildings shall not exceed one-half mill on each dollar of said valuation; and the aggregate amount of such debt shall never at any time exceed the sum of fifty thousand dollars (except as provided in Section five of this article), and in all cases the valuation in this section mentioned shall be that of the assessment last preceding the creation of said debt; * * *.''

''Sec. 4. Law creating debt.—In no case shall any debt above mentioned in this article be created except by a law which shall be irrepealable, until the indebtedness therein provided for shall have been fully paid or discharged; such law shall specify the purpose to which the funds so raised shall be applied, and provide for the levy of a tax sufficient to pay the interest on and extinguish the principal of such debt within the time limited by such law for the payment thereof, which in the case of debts contracted for the erection of public buildings and supplying deficiencies of revenue shall not be less than ten nor more than fifteen years, and the funds arising from the collection of any such tax shall not be

applied to any other purpose than that provided in the law levying the same, and when the debt thereby created shall be paid or discharged, such tax shall cease and the balance, if any, to the credit of the fund shall immediately be placed to the credit of the general fund of the state."

Before attempting to determine whether a debt is created by the questioned legislation, it is desirable to ascertain from the two acts just what they authorize to be done.

First: The highway department is authorized to enter into a contract with the Federal Government involving the following transactions:

A. The Federal Government is to advance to the highway department for the highway supplementary fund an amount not to exceed $25,000,000 for construction, reconstruction, and maintenance of the public highways and all other expenses incidental thereto.

B. Revenue anticipation warrants to bear not more than four per cent interest per annum to be paid serially in annual installments beginning not later than three years and extending not more than thirty years from the date thereof are to be issued to the Federal Government to be paid from the highway anticipation fund.

C. The highway department is to create the sinking fund to be known as the highway anticipation fund for the payment of said warrants, interest thereon, and charges of banks and trust companies for making payments thereon out of the highway fund into which is to be paid the excise taxes derived from the imposition of any license, registration fee, or other charge with respect to the operation of any motor vehicle upon any highway in the state and from the imposition of any excise tax on gasoline or other liquid motor fuel.

We hold that the foregoing transaction does not create a debt within the inhibition of sections 3 and 4 of article XI of the Constitution. Mr. Justice Denison in *Shields v. Loveland,* 74 Colo. 27, 218 Pac. 913, says: "The defini-

tions of the word debt are many, and depend on the context and the general subject with reference to which it is used. 17 C. J. 1371. Its meaning in the sections of the Constitution and statutes now before us must be determined by their purpose, which was to prevent the overburdening of the public, and bankruptcy of the municipality. Clearly the revenue bonds are not within that purpose. The public can never be overburdened by that which it is under no obligation to discharge, nor can the city become bankrupt by what it does not have to pay. * * *''

The Supreme Court of New Mexico, in *Seward v. Bowers,* 37 N. M. 385, 24 P. (2d) 253, uses the following language which clearly defines a debt in the constitutional sense: ''The idea of a 'debt' in the constitutional sense is that an obligation has arisen out of contract, express or implied, which entitles the creditor unconditionally to receive from the debtor a sum of money, which the debtor is under a legal, equitable, or moral duty to pay without regard to any future contingency.''

Plaintiff, to support his contention that a debt is created, relies mainly on the following Colorado cases: *Shields v. Loveland, supra; Searle v. Town of Haxtun,* 84 Colo. 494, 271 Pac. 629; *Reimer v. Town of Holyoke,* 93 Colo. 571, 27 P. (2d) 1032, and *In re Senate Resolution No. 2,* 94 Colo. 101, 31 P. (2d) 325.

In *Shields v. Loveland, supra,* we held that a city might pledge future revenues of a municipal lighting plant, the construction of which was to be financed with funds derived from the sale of bonds to be paid solely out of the revenues from the plant, and that such bonds did not constitute a municipal indebtedness within the provisions of section 8, article XI of the Constitution, in which are used the same words prohibiting a municipality from contracting debts as appear in section 3, article XI, which applies to the state.

In *Searle v. Town of Haxtun, supra,* we held that the net revenues of a preexisting plant, amounting to $5,000

per year, together with the revenues from the plant as improved, might be pledged to pay revenue bonds issued to finance the improvement, and that this did not create a debt inhibited by the Constitution.

In *Reimer v. Town of Holyoke, supra,* the board of trustees of the town of Holyoke *entered into a contract* (Italics ours) January 20, 1931, for the purchase of two Diesel engines, and "no ordinance declaring the necessity [of the improvement] was ever passed" as required by section 9128, C. L. 1921, which is as follows: "No contract shall be hereafter made by the city council or board of trustees, or any committee or member thereof; and no expense shall be incurred by any of the officers or departments of the corporation whether the object of the expenditure shall have been ordered by the city council or board of trustees or not, unless an appropriation shall have been previously made concerning such expense, except as herein otherwise expressly provided." The contract was not within the proviso. In this case the court said further: "This contract *creates other obligations* [Italic ours] which the town is pledged to meet that cannot be paid out of the income from the plant and for which the town could be held liable under all the circumstances. While, in the Shields and Searle cases, supra, the full and only liability is fixed by the terms of the bonds, if no income, the bonds will default; while here, regardless of income, the town must respond for certain obligations under some conditions of the contract." And again the court said: "The additional obligations and liabilities incurred by this contract are not merely incidental to the main transaction, but *create debts* independent thereof, \* \* \*." (Italics ours). The court also said: "The $3,225, first payment is not from a special fund. It came from a fund partly created by taxation, but if it came entirely from the *past* income of the plant, it was equivalent to money raised by taxation because it took its place for all uses." (Italics ours) (It was then contracted to be paid out, available for the

same purposes as funds raised by general taxation) * * * ''This [the payment of the $3,225—one of the additional obligations of the contract] was an impairment of the general municipal revenues, and any obligation * * * contracted to be paid, out of a fund that is the product of a tax levy [as was the general fund into which accumulated earnings of the plant had gone and out of which fund the $3,225 was to be paid] is a debt within the purpose of the constitutional limitation.''

The opinion in *Reimer v. Town of Holyoke,* rests solely on the construction of a contract and does not modify or limit the holding in *Shields v. Loveland* or *Searle v. Town of Haxtun, supra.* The construction given the contract shows that the rules announced in the Shields and Searle cases are not applicable to the case here under consideration. But plaintiff says that in *Searle v. Town of Haxtun,* Justice Denison, speaking for the court, said: ''If a tax was required there was of course a debt * * *.'' These words should be considered in their setting. The writer of the opinion said: ''Plaintiff's cases on the other hand, with one exception, show that the bonds there in question required either *a tax beside the income,* to pay them, or that there was a mortgage or pledge of property for that purpose. *If a tax was required there was of course a debt * * *.''* (Italics ours). There was no tax required in the case the court was considering and its observation distinguishing cases cited might have been omitted without changing in any way the holding or rule announced determining the real issue of that case, which was whether revenue bonds payable out of the income of an existing utility as improved by the proceeds of the bonds, were debts in the constitutional sense. However, the reason of the statement is apparent. If the proceeds of a tax that the city could use for general purposes was pledged, then the income of the plant—the special fund— failing, the city would have a general obligation to pay the bonds, they would cease to be revenue bonds and become general obligation bonds. Mr. Justice Burke in

*In re Senate Resolution No. 2, supra,* points out the distinction that it is the availability of revenue for general purposes that makes its pledge to pay even a debt fall within the prohibition of section 3, article XI, supra. He uses these words: ''Since the purpose of section 3 of article XI is to prevent the pledging of revenues of future years, a statute which at the same time it creates a debt, creates the fund to pay it, and which fund *would not be otherwise available for general purposes* [Italics ours] is clearly outside the constitutional prohibition.'' Reduce the foregoing statement to conditional and causal clauses and a conclusion and what have we? (a) If a statute creates a debt; (b) if it creates a fund to pay it; (c) if that fund would not be available for general purposes if not used to pay the debt; (d) (conclusion) the statute is not prohibited by section 3, article XI of the Constitution because the purpose of that section is to prevent the pledging of future revenues. What revenues? Clearly the revenues that create the fund referred to—the fund to pay the debt—a fund that would *not be available for general purposes*. The words used clearly mean this and can mean nothing else.

The cases of *Shields v. Loveland* and *Searle v. Town of Haxtun, supra,* both meet the conditions required to take them out of the provisions of section 3, article XI, supra, and, as pointed out, *Reimer v. Town of Holyoke, supra,* recognized the principle announced in those cases, but did not fall within the rule by reason of the form of the contract involved.

In *Shields v. Loveland, supra,* future net revenue from a plant *to come into existence* was pledged. In *Searle v. Town of Haxtun,* future net revenue from a plant in existence to the amount of $5,000 annually, and from improvements to be made, was pledged. In both cases the procedure was held proper under the special fund doctrine. By the 1934 amendment to article X of the Constitution (S. L. '35, p. 328), the roads of the state are, in effect, made the producers of a special fund, for the

gasoline tax is a tax on motor fuel used in propelling vehicles along the highways. It amounts to an indirect tax for the use of the highways by motor vehicles. Moreover, the amendment makes the proceeds of the taxes mentioned therein *not available for general purposes.* At the time *In re Senate Resolution No. 2, supra,* was decided, *they were available for general purposes.* This fact distinguishes that case from the case here under consideration.

The amendment to article X, to which reference is made, is in the following language: ''That Article X of the Constitution of the State of Colorado be amended so as to add an additional Section thereto to be numbered Section . . . to read as follows: Section . . . . On and after July 1, 1935, the proceeds from the imposition of any license, registration fee or other charge with respect to the operation of any motor vehicle upon any public highway in this state and the proceeds from the imposition of any excise tax on gasoline or other liquid motor fuel shall, except costs of administration, be used exclusively for the construction, maintenance, and supervision of the public highways of this state.''

██ We hold that the pledging of the future excise revenues making up the fund to pay the anticipation warrants provided by the acts in question does not create a debt prohibited by sections 3 and 4 of article XI of the Constitution. That the gasoline tax revenue is an existing revenue and not a new revenue is not a material or a controlling factor under the rule announced in *Searle v. Town of Haxtun, supra,* permitting the pledge of existing revenue. That the constitutional special fund is raised by excise taxation we do not regard as a bar to the application of the special fund doctrine under the law as announced in *Searle v. Town of Haxtun, Reimer v. Town of Holyoke* and *In re Senate Resolution No. 2, supra,* nor do we overrule or modify the holdings of those cases, that a debt is created *when an obligation is created that requires revenue from a tax otherwise avail-*

*able for general purposes to meet it.* The payment of the anticipation warrants out of the fund provided by the act can never place any burden on the revenues available for appropriation for general state purposes.

 The second major contention of the plaintiff is that the acts tie the hands of future legislatures by providing that the laws with reference to the existing excise taxes, out of which the fund to pay the anticipation warrants is to be created, shall not be repealed or amended so the revenues shall be so reduced as not to be sufficient to pay the warrants and interest as they become due and payable. It is contended that this is in violation of sections 1 and 24 of article 5, of the state Constitution: These sections are as follows:

"Section 1. General assembly—Initiative and referendum. The legislative power of the state shall be vested in the general assembly consisting of a senate and house of representatives, both to be elected by the people, but the people reserve to themselves the power to propose laws and amendments to the constitution and to enact or reject the same at the polls independent of the general assembly, and also reserve power at their own option to approve or reject at the polls any act, item, section or part of any act of the general assembly.

"The first power hereby reserved by the people is the initiative, * * *.

"The second power hereby reserved is the referendum, * * *."

"Sec. 24. Revival, amendment or extension of laws. —No law shall be revived, or amended, or the provisions thereof extended or conferred by reference to its title only, but so much thereof as is revived, amended, extended or conferred, shall be re-enacted and published at length."

The plaintiff in his complaint alleges, and the allegation is of course admitted by the demurrer, "That the revenues currently accruing to the state highway fund are far in excess of the amounts to be paid into the sink-

ing fund for the payment of said warrants and interest thereon." In his brief, counsel for plaintiff makes the statement, based on reports of the auditor of state, that in round numbers the gasoline tax exceeds the property tax in Colorado by $1,500,000 each year, and that the general property tax for 1934 was in round numbers $3,826,623. It will be observed that the restriction on future legislative action is only to the extent that the laws creating the revenues for the highway fund "shall not be repealed or amended so that the aggregate of revenues for such purposes will be insufficient to pay the annual installments of principal and interest and retire revenue anticipation warrants issued under the provisions of this act as the same shall become due and payable." The laws that create that fund are the laws that raise the revenue that must be used for the purposes specified in the 1934 amendment to article X, supra.

The conclusion we have reached, that the contract authorized does not create a debt of the state in the constitutional sense under sections 3 and 4 of article XI of the state Constitution is not equivalent to determining that the authorized transaction does not constitute a contract. It does constitute a contract for the payment of money on a contingency, that contingency being that the revenue from the excise taxes, now in force, shall be sufficient to pay the obligations and interest as they mature. That in all human probability, as indicated by the figures above quoted, the revenues will be more than sufficient, does not prevent the obligation to pay being contingent and not absolute. Since section 3, article XI, supra, limits the power of the legislature only as to the contracting of a debt, then under its residual plenary power it may make a contract or authorize the making of a contract by a state institution, the highway department, and if the contract necessitates the continued existence of existing legislation, then future legislatures are barred by the contract from modifying that legislation so that the obligation of the contract

will be impaired, for one of the powers delegated to the Federal Government was the power to restrict legislation by a state impairing the obligations of contracts. "No state shall * * * pass any * * * law impairing the obligation of contracts." Art. 1, sec. X, U. S. Constitution.

In *Fletcher v. Peck*, 6 Cranch 87, a case in which the state of Georgia, by a rescinding act of its legislature, sought to set aside a grant and conveyance of lands against purchasers from the original grantees of the land in a conveyance authorized by a former legislature on the ground that the legislature authorizing the grant was corrupted and acted from corrupt motives, Chief Justice Marshall stated the contention in that case—and it is the same contention made in this case—in these words: "The principle asserted is, that one legislature is competent to repeal any act which a former legislature was competent to pass; and that one legislature cannot abridge the powers of a succeeding legislature.

"The correctness of this principle, so far as respects general legislation, can never be controverted. But if an act be done under a law, a succeeding legislature cannot undo it. The past cannot be recalled by the most absolute power." The court held that the provision of the Federal Constitution prohibiting the state from passing laws impairing the obligation of contracts applied alike to executory and executed contracts and to contracts to which the state is a party as well as to contracts between private persons.

In *State of New Jersey v. Wilson*, 7 Cranch 164, the facts were these: The colonial legislature of New Jersey had authorized the purchase of certain lands for the Delaware Indians in consideration of their surrender of claims to certain other lands held by them, and in the act it was provided "that the lands to be purchased for the Indians aforesaid shall not hereafter be subject to any tax, any law, usage or custom to the contrary thereof, in anywise notwithstanding." The act also

contained a provision restraining the Indians from alienating the lands. In 1801, the New Jersey legislature passed an act permitting the lands to be alienated so the Indians could remove from the state, but in this act did not make it a condition of such consent that the Indians release the lands from tax exemption. In 1804, the legislature sought to tax these lands then in the hands of grantees of the Indians. The court speaking again through Chief Justice Marshall said: "Every requisite to the formation of a contract is found in the proceedings between the then colony of New Jersey and the Indians. * * * The purchaser succeeds, with the assent of the State, to all the rights of the Indians. He stands, with respect to this land, in their place, and claims the benefit of their contract. This contract is certainly impaired by a law which would annul this essential part of it.''

In *East Hartford v. Bridge Co.*, 17 Conn. 79, decided in 1845, the court said: "It is quite too late now to contend, that the legislature may not modify or restrict the future exercise of its own powers. It always does this, when it makes a contract, which it cannot impair. And whether such contract be executed or executory, it matters not. There is perhaps no more essential and perfect right of sovereignty, than the right and power of taxation; and yet a legislature may, by contract, even relinquish this right over a limited and specified territory, and for an object promotive of the public good. *New Jersey v. Wilson*, 7 Cranch 168. *Atwater v. Woodbridge*, 6 Conn. R. 223. *Osborne v. Humphrey*, 7 Conn. R. 335. *Landon v. Litchfield*, 11 Conn. R. 251.''

In 1931, the Supreme Court of Montana, in *State ex rel. v. State Highway Commission*, 89 Mont. 205, 296 Pac. 1033, 1036, said: "The statement that one legislative assembly cannot enact a statute which a subsequent assembly may not repeal is correct as an abstract proposition. But one legislative assembly, if not limited by the terms of the Constitution, may enact a statute author-

izing a lawful contract, which, if entered into, will be beyond the repealing power of a subsequent assembly. It is true, of course, that a subsequent assembly may, if it sees fit, reduce the exaction of five cents per gallon, if a less exaction will be sufficient to pay the debentures.''

From the foregoing citations it appears that for more than a century and a quarter, it has been recognized as a sound principle of our jurisprudence that a contract lawfully entered into by the state through legislative action cannot be impaired by subsequent legislative acts. If, as held by the Supreme Court of the United States in *State of New Jersey v. Wilson, supra,* the sovereign power of the state to levy taxes may not be exercised when it impairs the obligations of a contract, it logically follows that the state of Colorado after entering into a contract that does not create a debt and is therefore not inhibited by her Constitution, which contract requires that for a limited time the state shall leave in effect an already exercised sovereign power of excise taxation, may not by future legislation impair the obligations of that contract by refusing to continue such exercise of her taxing power. That the law itself declares certain acts shall be irrepealable after contract obligations shall have been entered into under its authority is a matter of no moment. They would be irrepealable, not because so declared, but whether so declared or not. That the legislature properly stated the principle of law applicable should not militate against the law.

The provisions of the Constitution with reference to the initiation of laws are not a bar to the law being irrepealable, because the initiation of laws is subject to the delegation of power to the Federal Government to prohibit the states, both by their legislatures and by direct action of the people from passing laws that impair the obligations of any contract.

Plaintiff further contends that each and all of said acts are void because in conflict with the 1934 amendment to article X of the state Constitution herein-

before mentioned. His counsel concedes that the General Assembly had full power over excise taxes and could order their expenditure for any governmental purpose it saw fit before the passage of that amendment. Since its passage it is limited in the use of the proceeds of those taxes mentioned in the amendment to the objective declared thereby. The question of whether the amendment is violated resolves itself to this: Is the issuing of interest bearing warrants for moneys advanced by the Federal Government to be used "exclusively for construction, maintenance and supervision of the Public Highways of the State" and the paying of bank and trust company charges for the collection of such warrants, a diversion of the funds from the constitutional objective set forth in the amendment? The Supreme Court of Kansas in *State ex rel. v. State Highway Commission*, 138 Kan. 913, 28 P. (2d) 770, 772, in a case similar to the one at bar, in which it was construing the statute of that state, substantially the same as the Colorado statute, said: "The fact that interest is paid from a fund upon a warrant drawn on that fund has never been regarded as a diversion of the fund for purposes other than that for which it was raised." The following cases announce the same principle of law. *State ex rel. v. Farwell*, 3 Pin. (Wis.) 393, decided in 1852; *Adams v. Greene*, 182 Ky. 504, 206 S. W. 759; *Watkins v. School Board*, 173 La. 259, 136 So. 591. In our opinion the amendment of 1934 declared the object to which the funds arising from the excise taxes therein mentioned should be applied, namely, for road purposes, as distinguished from other governmental purposes, to which, just prior to the amendment, portions of the funds had been diverted; but it did not attempt to limit the legislature as to the means it should employ or the policy it should adopt to attain that objective. We hold, therefore, that the action authorized under the acts challenged does not violate the 1934 amendment to article X of the Constitution.

It is further objected that chapter 181, Session Laws 1935, authorized expenditures by the state of Colorado greatly in excess of the total tax provided by law available to meet such expenditures and does not provide for an annual tax to defray such expenditures, in violation of sections 2 and 16 of article X of the Constitution of Colorado. These sections are as follows:

"Sec. 2. Tax provided for state expenses.—The general assembly shall provide by law for an annual tax sufficient, with other resources, to defray the estimated expenses of the state government for each fiscal year."

"Sec. 16. Appropriations not to exceed tax—Exceptions. No appropriation shall be made, nor any expenditure authorized by the general assembly, whereby the expenditure of the state, during any fiscal year, shall exceed the total tax then provided for by law and applicable for such appropriation or expenditure, unless the general assembly making such appropriation shall provide for levying a sufficient tax, not exceeding the rates allowed in section eleven of this article, to pay such appropriation or expenditure within such fiscal year. This provision shall not apply to appropriations or expenditures to suppress insurrection, defend the state, or assist in defending the United States in time of war."

Section 2 is a mandate to the legislature. It limits its otherwise plenary power to act or not to act by requiring an *annual tax* to be provided sufficient, when supplemented by other resources of the state, to defray the estimated state expenses for each fiscal year. The mandate is not absolute, but contingent; contingent on the estimated expense exceeding the other resources which might be derived from various sorts of excise taxation. *Parsons v. People,* 32 Colo. 221, 234, 76 Pac. 666. The section relates to the raising of revenue. It says nothing about expenditure of revenue, and it is of the manner of spending it that the plaintiff complains. Ordinarily, a private citizen has no concern if a tax is lawfully exacted—as concededly the gasoline tax is—

348

with how the proceeds are expended if used for a governmental purpose; but in this case the question is raised as to whether the proposed use is for a governmental purpose under the constitutional amendment of 1934 and for that reason we deem it proper to consider plaintiff's constitutional objections to the validity of the contract. Since his objection is to the manner of spending the tax, we fail to see how or wherein a statute that provides merely for entering into a contractual obligation concerning the payment of money can possibly be inhibited by a section that is merely a mandate to the legislature to do a specific thing—to levy an annual tax—if the revenues from other sources are insufficient to meet the needs of the state. Said section 2 relates merely to the raising of revenue, not to its disposition after it is raised.

In considering sections 2 and 16 of article X of the Constitution, it is pertinent to observe that the language used in both is clearly applicable to ad valorem taxes and at least of debatable applicability to excise taxes. But in determining this case, we need not and do not determine whether the two sections relate solely to ad valorem taxes. That matter can and should wait for determination until the question is directly involved in an appropriate action.

Neither section 2 nor section 16 is applicable to the question of the creation of a debt. The matter of debts is covered by article XI of the Constitution. We have held in this case that the contract to be entered into with the Federal Government and the plan devised to repay the advances from a special constitutional fund does not create a debt contemplated by the constitutional prohibition. Since the amendment of 1934 sets aside and fixes the amount—the whole of the revenues from the taxes mentioned—as applicable to road purposes, no appropriation by the legislature is necessary. The power of the legislature over the funds thus realized is limited to *authorizing their expenditure,* and determining the policy of road construction, maintenance and supervision, with-

in the constitutional limitations as to the use of such funds. This being the sole power of the legislature, that portion of section 16, supra, applicable to the situation, is that relating to expenditures which is in the following language: ''Nor [shall] any expenditure [be] authorized by the general assembly, whereby the expenditure of the state, during any fiscal year, shall exceed the total tax then provided for by law and applicable for such * * * expenditure.'' Assuming that the legislature by chapter 181, supra, has authorized the expenditure of $25,000,000 and that this amount exceeds the revenues of the fiscal years in which it is to be expended, this does not bring the expenditure within the inhibition, because, to bring it within the inhibition, as a result of such authorized expenditures the *state must be obligated to spend during a fiscal year more revenue than is available for expenditure during such fiscal year.* The condition that must exist in order to make the inhibition of such authorization of expenditure effectual is in the following words of the section: ''Whereby [as a result of such authorization] the expenditure of the state, during any fiscal year, shall exceed the total tax then provided for by law and applicable for such * * * expenditure.'' Since the payments on the warrants to be made each year are to be out of a special fund and such payments are contingent on the excise taxes from which the fund is to be created producing enough revenue to create the fund, a situation can never arise from the authorization of the expenditure of $25,000,000 under the plan set up whereby or as a result of which the *"expenditure of the state, during any fiscal year,* shall exceed the total tax then provided for by law and applicable for such * * * expenditure.'' Since there can never arise a condition such that the revenues *available* for each year's expenditures of the state and *applicable* to the payment of the warrants will be insufficient to meet the payments required to be made, we need not consider the remaining part of section 16, for it provides for levying

an ad valorem tax only in case there shall be such a deficiency. We hold, therefore, that section 16 of article X is not violated.

What we have said with reference to the power of the legislature over the fund created by the 1934 amendment, disposes of the objection made by plaintiff that chapter 181 violates section 33 of article V of the Constitution, which is as follows: "No money shall be paid out of the treasury except upon appropriations made by law, and on warrant drawn by the proper officer in pursuance thereof." The object of an appropriation by the legislature is to set apart from the general revenues of the state, funds limited as to amount and as to their application in order that the authorized disbursing body and officers may be limited and guided in such expenditures and disbursements. 4 C. J. 1458. The amendment itself makes an appropriation of the funds and none is necessary by the legislature. It follows that section 33, supra, is not violated.

Plaintiff contends that chapter 181, supra, violates section 34 of article V and the 1934 amendment to article X in that "by its terms it makes an appropriation for charitable purposes to persons, corporations and communities not under the absolute control of the state." Said section 34 in so far as material is as follows: "No appropriation shall be made for charitable, industrial, educational or benevolent purposes, to any person, corporation or community not under the absolute control of the state, * * *." This objection is evidently directed to section 1 of the chapter, which is as follows: "A critical emergency arising out of the present economic depression having caused widespread unemployment, disorganization, of industry and agriculture, and made hopelessly inadequate, federal, state and local relief funds, it is hereby declared to be the policy and purpose of the General Assembly to allay the present widespread public discontent and social unrest, to relieve the needy and destitute citizens of this state from want

and privation by provision for employment in the form of construction, improvement, reconstruction and maintenance of highways and bridges.''

It cannot be questioned that the state has the power to construct, improve, reconstruct and maintain public highways and bridges. It has determined to exercise that power in a certain manner. We know of no principle of law that authorizes courts to inquire into the motives of the legislature in exercising its powers. Courts are concerned only with the power of the legislature to act and not with the motive inducing its action; and this is equally true whether the motive is set forth in the law or left a mere matter of conjecture. If in acting within its powers a collateral objective may be attained, that is a matter proper for the consideration of the legislature in formulating its legislative policy, but is no concern of the courts. The collateral objective sought to be attained by the act here under consideration, ''to allay the present widespread public discontent and social unrest, to relieve the needy and destitute citizens of this state from want and privation by provision for employment'' is certainly a matter with which government may well be concerned and may and should consider in shaping a legislative policy, for the very purpose of government, as announced in the preamble of the Constitution of Colorado, is to ''insure tranquillity;'' and ''promote the general welfare.'' If we were asked to sustain the acts on the grounds of emergency or necessity, then the cases of *Walker v. Bedford,* 93 Colo. 400, 26 P. (2d) 1051; *In re Senate Resolution No. 2, supra;* and *Schechter Poultry Corporation v. U. S.* ... (U. S.) ...., 55 Sup. Ct. 837, 79 Law Ed. 888, to which our attention is called, would require our consideration of this point; but since we hold that what the acts authorize to be done is not inhibited by the Constitution and therefore is within the power of the legislature, we need not and do not go further in search of grounds that certainly would be questioned in the light of the foregoing decisions.

352

The further objection is raised that chapter 181, supra, violates article III, and section 1, article V, of the Constitution in that it delegates nondelegable legislative powers to the highway department. Article III is as follows: "The powers of the government of this state are divided into three distinct departments,—the legislative, executive and judicial; and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments shall exercise any power properly belonging to either of the others, except as in this constitution expressly directed or permitted."

Section 1, article V, so far as material, provides: "The legislative power of the state shall be vested in the general assembly consisting of a senate and house of representatives, both to be elected by the people, but the people reserve to themselves the power to propose laws and amendments to the constitution and to enact or reject the same at the polls independent of the general assembly, and also reserve power at their own option to approve or reject at the polls any act, item, section or part of any act of the general assembly.

"The first power hereby reserved by the people is the initiative, * * *.

"The second power hereby reserved is the referendum, * * *."

The act does not violate these constitutional provisions. It prescribes the limitations of the contract as to amount, rate of interest and time of payment, and empowers the institution it has created—the highway department—to enter into such contract. There is nothing lacking in the act to determine the maximum liability and the conditions of the liability that may attach to the special fund. The highway department, as created, has only the powers conferred upon it by law and cannot go beyond the scope of its authorization in making a contract. It was not possible to fix the amount to be advanced, or the interest or rate of repayment because

such matters depend partly upon the Federal Government, the other party to the contract. The full $25,000,-000 may or may not be available. By the law as enacted the legislature announced it as the policy of the state to procure $25,000,000 if that amount is available. If the full amount should be available and the highway department then refused to procure it, the question of whether the act is a mandate to the department to procure the full amount or whether it leaves it to the discretion of the department to procure such part of the amount available as it sees fit, if raised and before us, can then be determined. If the legislature has the power, and we have held that it has in this case, to authorize the procuring of $25,000,000 if available, and does do so, but fails to provide the means by failing to give specific directions to the instrumentality that is to carry out its will, by reason of which only a part of the available amount is secured, this is but a failure to exercise the full power that the legislature possessed and does not invalidate the power so far as asserted. It is significant that the act says that its object is to enable the people "to participate in and receive the *full* benefits of federal legislation and *funds* available or *to be made available,* etc." (Italics ours). In the light of such declaration, it is scarcely probable that the highway department will assert that it is vested with discretion within the limits of the funds available.

Section 24, article V, of the Constitution provides that "No law shall be revived, or amended, or the provisions thereof extended or conferred by reference to its title only, but so much thereof as is revived, amended, extended or conferred, shall be re-enacted and published at length." Chapter 181, supra, does not violate this section. We have held that a contract is authorized and that no law can be passed impairing its obligations. It is not necessary that the laws that are not to be modified or repealed by future legislation be mentioned. The extension of such laws does not follow from legislative

354

fiat, but from the Federal constitutional prohibition that no law shall be passed impairing the obligations of a contract.

Plaintiff cites no cases in support of his contention that the acts in question violate the provisions of section 11, article II of the Constitution, which provides, "That no * * * law * * * making any irrevocable grant of special privileges, franchises or immunities, shall be pased by the general assembly." We hold that contention without merit. Of like character is his contention that the acts violate section 25, article II, "That no person shall be deprived of life, liberty or property, without due process of law." We held in *Altitude Oil Co. v. People,* 70 Colo. 452, 454, 202 Pac. 180, that the gasoline tax is not a property tax and that it does not violate this provision of the Constitution.

Plaintiff has raised the same objections to the constitutionality of both chapter 181 and chapter 124, supra. Most of these objections were directed to chapter 181. In some parts of this opinion in considering the objections, we have dealt with them as though directed only to the one act, but where we have done so, it was because we saw no applicability to the other act. So far as the objections urged are concerned, we hold them not valid as to either act.

The judgment is reversed and the cause remanded with instructions to sustain the demurrer.

Mr. Chief Justice Butler, Mr. Justice Bouck and Mr. Justice Holland concur.

Mr. Justice Campbell, Mr. Justice Burke and Mr. Justice Hilliard dissent.

Mr. Chief Justice Butler, concurring.

The decision seems to me to be right.

The vigorous dissenting opinion of my brother Hilliard does not shake my faith in the conclusion that the statute assailed does not provide for the contracting of a

debt within the inhibition of section 3 of article 11 of the state Constitution. The case, I submit, comes within the Special Fund doctrine repeatedly announced by this court in the cases cited in the principal opinion. The situation is this: An extensive public highway program is to be carried out. New highways are to be constructed throughout the state. Existing highways are to be improved. It is work that must be done sometime. The General Assembly, the exclusive judge of matters of public policy, has concluded that it is wise to have all this done during the present depression, while thousands of men are unable to find private employment, rather than to have the work distributed over a period of many years. To do the work will involve the expenditure of millions of dollars. That money is not now on hand. The federal government is to advance the money necessary to make these public improvements, and is to receive revenue anticipation warrants payable solely out of what in effect are license fees to be paid by those who use the public highways of the state for motor vehicle traffic. The 1934 amendment of article 10 of the Constitution segregates for exclusive use upon the public highways of the state all the proceeds derived from the imposition of licenses, registration fees and other charges with respect to the operation of motor vehicles upon the public highways of the state and the proceeds derived from the excise on gasoline. Such are the revenues out of which the advances are to be repaid to the federal government. The warrants, to be given are revenue anticipation warrants and do not create a debt in the constitutional sense. Those revenues are derived, not from general taxation, but from impositions which, though not tolls in the strict legal sense, bear some resemblance thereto, because, in effect, they are charges for the privilege of using the highways. It is clear, under all the authorities, that if a state obtains an advance of money to construct a road or bridge, to be repaid exclusively out of the tolls received, it would not

offend against the constitutional provision inhibiting the contracting of a debt; and the same principle applies here. Where revenue anticipation bonds or warrants are to be paid *exclusively* out of rents from dormitories, or charges collected from the users of electricity, gas, water, bridges *or roads,* such bonds or warrants do not create a debt within the inhibition of the state Constitution.

We need not be alarmed by the suggestion that highways do not endure for thirty years, and that from some other source must come the money to rebuild and repair the highways. The 1934 Amendment, supra, provides that the proceeds derived from the imposition of motor vehicle licenses, and from excise on gasoline, etc., shall, except costs of administration, be used exclusively, not only for the construction of public highways, but also for their *maintenance.*

Mr. Justice Hilliard, dissenting.

This case should be regarded as controlled by *In Re Senate Resolution No. 2,* 94 Colo. 101, 31 P. (2d) 325 and *Walker v. Bedford,* 93 Colo. 400, 26 P. (2d) 1051, and the judgment affirmed. In the first mentioned matter (opinion per Burke, J.) proposed legislation without actual difference to that here challenged was held to be in contravention of section 3, article XI, of the Constitution. The distinctions the court finds between that legislation and the statutes now before us will be found upon examination to be something else, something that may fairly be termed evasions. That they are evasions, palpable evasions, is determined by quoting but a sentence of Mr. Justice Burke's opinion: The "purpose" (of the constitutional provision) was "to prevent the pledging of revenues of future years." That the Walker case is likewise of application is not explained away by the court's insistence that the legislative recitation of emergency has not influenced its judgment. I venture to say that in the absence of emergency the court would recoil unanimously from the suggestion that this legisla-

tion is permitted by the fundamental law. So also would the legislature and the executive. A hard case has made bad law indeed.

I admire, while I deplore, the cunning logic that convinces the court that black is white and that there is no difference between heaven and hell. It will be news to our people that the promise of the state to pay twenty-five millions of dollars out of the proceeds—and *all* of the proceeds—of the various excises having to do with motor vehicles is not a debt. The opinion will disabuse their minds of that fallacy, although it may be that the more obtuse will be unable to perceive why the state should pay out one million dollars of interest annually on obligations which it does not owe. And there may be some who will not follow the reasoning that the repayment of the twenty-five millions out of the motor vehicle excises "can never place any burden on the revenue available for general state purposes." They may feel, as all men know, that highways do not endure for thirty years, and that from some other source of revenue must come the money to rebuild and repair the roads presently to be built and paid for with the ordinary highway revenues of the next thirty years. And there may be those who obstinately believe that if the state promises to pay twenty-five millions of dollars it should keep its promise and that if the motor vehicle excises fail—as well they may in the light of invention—the lender should nevertheless be paid. Should it come to pass that the excises fail there will not be found a lack of plausible gentlemen, mayhap those who have argued here, to call upon the state to perform its plain moral duty and raise and pay that twenty-five millions to protect the good name of the commonwealth. Our history dictates that such will be our policy. Men who dealt with the state and extended it credit in the past well knowing the warrants they received were void and worthless yet were not bowed down with their prospective losses for they knew the good people would not repudiate their claims and

358

thus besmirch their honor. We issued, by constitutional amendment, general obligation bonds to pay those trusting creditors. The buyer of the twenty-five millions of no-debt paper now proposed will feel safe in his belief that it is a debt whether the court thinks so or not. I confess, when I consider the many phases of this problem, that I am embittered, and deeply embittered. The court has worshipped at the shrine of construction, often and here the falsest of gilded gods, and for that sin the sweat of the people shall not fail for more than a generation.

"The Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning; where the intention is clear there is no room for construction and no excuse for interpolation or addition." *United States v. Sprague,* 282 U. S. 716, 51 Sup. Ct. 220. This court has often announced the same wholesome doctrine. Cf. *People ex rel. v. May,* 9 Colo. 80, 10 Pac. 641; *In re Lowrie,* 8 Colo. 499, 19 Pac. 489. The Constitution of Colorado ordains that "The State shall not contract any debt by loan in any form." It will be perceived instantly that this permits the state to enter into an irrevocable contract to borrow and pay twenty-five millions of dollars out of our only practicable source of road-building revenue, the proceeds of the motor vehicle excises. The very heavens protest against so monstrous a construction of the document conceived by the people for their protection against rapacity. If this be law, and the court has said it is, there is no limit whatever and the constitutional limitation and prohibition of debt might as well be stricken from the instrument altogether. The language of the Constitution could not have been more imperatively or understandingly phrased. And yet, it is overthrown by niceties so refined as to be nonexistent and logic that destroys both the letter and the spirit.

The court has been at pains to demonstrate that In Re

Senate Resolution No. 2, supra, is authority for the conclusion reached that a promise to repay twenty-five millions of dollars is not a debt. It is said the doctrine of that case is that only where revenue available for general purposes is required for payment is a debt created. No such construction is warranted. The court has failed understandingly to consider the "special fund" theory, although Brother Burke did not fail clearly to state the rule in that respect. The true, and the only, special fund rule in connection with debt prohibitions is that an inhibited debt is not created where the bondholders must look for repayment to the enhancement of values, as in the case of local improvement districts, or to earnings and profits, as in the case of so-called revenue bonds, arising out of the operation of publicly owned utilities. Whether that is a sound doctrine I do not now inquire, but it is the extent of the doctrine, and its basis is simply that the capital of the holders of local improvement district bonds, or of utility bonds, has produced and made possible the enhanced value or earnings with which alone the bonds are to be repaid. The tax load of the people, whether of excise or ad valorem, has not been increased or affected. But where, as here, the imposition of a tax is necessary to discharge the debt the rule fails at once. There is no enhancement of values, there are no earnings or profits, there is simply the creation of an additional and staggering debt to be discharged out of taxes wrung from the people. Our own decisions, rightly read, sustain this proposition. "If a tax was required, there was of course a debt." *Searle v. Town of Haxtun,* 84 Colo. 494, 496, 271 Pac. 629. *cf. Shields v. Loveland,* 74 Colo. 27, 32, 218 Pac. 913; *Reimer v. Holyoke,* 93 Colo. 571, 27 P. (2d) 1032.

No debt? The act by its terms is irrepealable. It pledges every penny of future motor vehicle excises to the payment of the euphemistically styled "Revenue Anticipation Warrants." The power of the Federal Constitution is cited by the court to show that come what

may these instruments cannot be repudiated. But it is no debt, says the court, because the source of the revenue may fail. By the same token no promise of the state to pay is a debt, for it is not inconceivable, and I think it is probable, that every source of revenue will dry up. We cannot live by taxing each other any more than the Fiji islanders could subsist by taking in one another's washing. The truth is, despite the court's protested adherence to the rule that a debt is created where funds otherwise available for general purposes must be applied in payment, that the debt-prohibiting sections of the Constitution have been discarded by the opinion in this case. As was suggested in the admirable presentation of counsel for the defendant in error, the legislature is now at liberty to set up a "State Excise Corporation," make all (other) excises payable to it, give it power to issue anticipation warrants, and pledge all excises to the end of time to repay them. Our present excises, excluding the sales tax, produce more than double the revenue of ad valorem impositions. With those pledged away, as I doubt not they will be, the persistency and ingenuity of tax spending men considered, the portent is clouded with gloom. Those of my generation are fortunate; we shall not see the full harvest of our sowing.

To sum up, and to emphasize, let it be remembered that the present use of future revenue, as prescribed by the act, involves potential interest charges in the sum of one million dollars annually, besides the "charges of banks and trust companies" and "necessary fiscal agency charges," and besides any discount and commission the highway corporation may care to give on the sale of the warrants, for there is no prohibition of such practices. This great yearly burden, not a cent of which will go for their benefit, must be paid by an already overburdened people, still bound to bear from year to year the expense of current road building and repair. This is manifestly unjust. It is waste. It is stupidity.

Every study shows that with a political state, as with an individual, each year's requirements absorb each year's income. The individual may be prodigal at his pleasure, pledging his future income to the extent of his credit. But the state of Colorado, it was believed until now, however much its careless or wasteful servants might dissipate its income of the year for the same year, enjoyed constitutional protection against present spoliation of next year's income. It is to be regretted that the General Assembly and the Executive, in turn, and now the court, disregarding the Constitution, and overriding precedent, should authorize and approve the immediate use of revenue to be collected in years to come. All history proves that revenue, whenever and however collected, is concurrently needed. The legislative branch of the government could have frowned on this monstrous folly in the first place, and the executive branch had constitutional power to still it in the second place, and now this court, as *did* the trial court, has but to announce adherence to the Constitution and its own pronouncements, to save the people from this orgy of exploiting the future. I assume it is a coincidence that private counsel, arguing here in favor of the constitutionality of this legislation, are of the private counsel who advised the Executive that an act of the same General Assembly in the matter of an income tax, designed to visit the burdens of taxation in accordance with ability to pay, was unconstitutional. Lawyers in private practice, their retainers not renounced, may convince a Governor that an act passed in the interest of the common man is unconstitutional, and cause its veto, but they have not persuaded me to subscribe to the legality of the act involved here, which, in addition to its unconstitutionality, as I am convinced, is subversive of the commonweal, and useful only to those who prosper and find seeming contentment in overreaching the general public. I am unable to frustrate this scheme, but I can pay modest tribute to the framers

of our organic law, who, well advised of the danger, believed they had protected the inarticulate against machinators.