(136 So. 591)

## WATKINS v. OUACHITA PARISH SCHOOL BOARD.

### No. 31293.

#### July 17, 1931.

Lester & Madden, of Monroe, for appellant.

David I. Garrett, Dist. Atty., and Theus, Grisham, Davis & Leigh, all of Monroe, for appellee.

ODOM, J.

This is an injunction proceeding brought by a taxpayer of Ouachita parish to prohibit the school board of that parish from anticipating the revenues to be derived from the levy of a special tax voted to establish a junior college, issuing certificates of indebtedness to be paid out of said tax and from pledging the tax, etc. There was judgment for defendant, and plaintiff appealed.

Act 173 of 1928 authorizes the parish school boards of the several parishes of the state, the parish of Orleans excepted, to create junior college districts, each district to comprise an entire parish and to create and establish junior colleges therein. Said act further authorizes the school boards to hold and conduct special elections in said districts for the purpose of levying special taxes, not to exceed 2 mills on the dollar of the assessed value of the property therein, for a period of ten years "to derive funds for constructing, aiding, sup-

porting and maintaining said Junior Colleges."

The act further provides that:

"The proceeds of said taxes, which may have been voted, shall be turned over to the Parish School Boards, calling the election, and to be placed in a special fund, dedicated and reserved for the purposes above set forth." Section 1.

On November 9, 1928, the school board of Ouachita parish adopted an ordinance creating a junior college district comprising the entire parish, and on the same day adopted an ordinance ordering a special election to be held throughout the district to take the sense of the property tax paying electors on the question whether a special tax of 1 mill should be levied for ten years "for the purpose of acquiring, erecting, constructing, establishing, operating and maintaining a Junior College."

The special election was held on December 12, 1928, and was carried in favor of the tax. But before the tax was levied, certain taxpayers of the parish sought to prohibit the levy on the alleged ground that Act 173 of 1928, pursuant to which all the proceedings were had, was unconstitutional. This court upheld the act in McHenry et al. v. Ouachita Parish School Board, 169 La. 646, 125 So. 841, and immediately thereafter the board levied the tax for the years 1929 and 1930.

The net annual amount realized from the 1-mill tax, on the present assessed valuation of property in Ouachita parish, is approximately $67,000, so that the gross amount to be collected, if the present assessed valuation of property is maintained, will be about $670,000. The board estimated that one-fourth of the tax to be collected would be necessary to maintain the junior college, leaving three-fourths of the amount available for the establishment of the college, the erection, fur-

nishing and equipping, etc., of the necessary buildings. It was estimated that the site for the buildings and the costs of their erection, etc., would be above $300,000, but, as the tax could be collected only year by year over the ten-year period, the board was confronted with the proposition that it must either postpone the establishment of the college until sufficient funds had accumulated from the annual collection of the tax for that purpose or anticipate its revenues from that source, borrow money, and pledge the tax for the payment of such amounts as might be borrowed.

The board was of the opinion that to postpone the establishment of the college until sufficient funds had accumulated to erect the buildings would be inadvisable and in a measure thwart the very purpose for which Act 173 of 1928 was passed and the purpose which prompted the taxpayers in voting the tax, that is, the immediate establishment and operation of a junior college. It was of the opinion that, in the interest of public education and the general welfare, the college should be established without delay. But there were not sufficient funds immediately available for that purpose, and it sought advice from its legal adviser as to whether it could anticipate the collection of the tax already voted, borrow money, issue its certificates of indebtedness, and pledge the tax for their payment, and was advised that it could.

It also had before it the Biennial Report of the Attorney General of the state covering the period from May 1, 1920, to May 1, 1922, which contained two letters, one written to the parish superintendant of schools of Sabine parish, and the other to the superintendant of Vernon parish, each expressing the opinion that, where a tax had been voted for the erection of a school building, the school board had the right, by appropriate resolution, to issue

notes, the same to be secured by pledge of the tax.

Acting upon the advice of its legal adviser and upon the opinion expressed in the above-mentioned letters, the school board, without waiting for the accumulation of sufficient funds from the annual collection of the tax, proceeded to establish the college. It selected a site, purchased it at a cost of $22,860, let a contract for the erection of the building at a cost totaling $253,115. These amounts, plus the estimated cost of the furniture, the leveling and grading of the grounds, and the fees of the architect, amounted to more than $308,-000, which the board obligated itself to pay.

Work on the buildings and grounds was begun immediately after the contract was let and the board paid to the contractors the sum of $77,456.08, this being 85 per cent. of the estimated value of the material and labor furnished. This amount was paid from the proceeds of taxes already collected.

On May 19, 1931, the board, in regular session, adopted a resolution setting out all the facts as above stated and reciting that:

"Whereas it is necessary to complete said building without delay in order to carry out the purpose and intent of Act 173 of 1928, and on emergency having arisen making it necessary to complete said building in order to protect the investment already incurred and the completion of the contract as let and the construction and maintaining of said building as a Junior College, it is necessary to borrow money and contract debts in the sum of Two Hundred Forty Thousand ($240,000) Dollars, covering a period of eight (8) years, thirty thousand (30,000) dollars of the principal to be paid annually and interest on the entire indebtedness paid semiannually."

It was resolved that the board borrow said sum and issue "notes or certificates of indebt-edness secured by pledge of three-fourths of one mill of said tax or as much thereof as may be necessary to pay said certificates and interest on the whole of said indebtedness semiannually on the first day of January of each year."

The plaintiff, after setting out all the above-stated facts, alleged that the ordinance authorizing and directing the borrowing of said sum, or any other amount, "is unauthorized and illegal and your petitioner, being a citizen, elector and property tax payer is interested in annulling the same, which was enacted without authority of law and should be rescinded and annulled and said Ouachita Parish School Board and its president and superintendant * * * restrained and prohibited from borrowing * * * and from issuing notes or certificates of indebtedness," and he prayed accordingly.

The school board, in answer, admitted, in substance, all the facts alleged, but averred that it was authorized under the law to borrow the necessary funds with which to complete the building and to issue notes or certificates of indebtedness secured by pledge of the tax for their payment.

The case was submitted on an agreed statement of facts, which are in accord with those hereinabove set out.

Articles 9, 10, and 11 of the agreed statement of facts read as follows:

"That acting on the opinion of the legal adviser for defendant said contracts were entered into on the belief that defendant could borrow money, issue notes or certificates of indebtedness secured by pledge to pay the contract price, less tax already collected, and that in addition to the opinion of defendant's legal adviser it had copy of opinion issued from the office of the Attorney General on July 6, 1921, and also copy of opinion from

office of Attorney General of May 18, 1922, which opinions were embodied in biennial report of the Attorney General to the Legislature of the State of Louisiana for two years from May 1, 1920 to May 1, 1922, which opinions are hereto annexed and made part of this admission.

"That it is absolutely necessary for defendant to borrow money for the completion of said building and the furnishing of same and meet the expenses shown by the statement annexed or default on its contract and leave the works and material and partially constructed building unprotected from either rain, wind or sunshine.

"That in accordance with said Act 173 of 1928 the proceeds of said special tax of one mill is to be used for the sole purpose of erecting, constructing, establishing, operating and maintaining said Junior College and that it has no other source of revenue and that the three-fourths of one mill ordered pledged by the ordinance to secure the notes or certificates of indebtedness, with interest, will be more than sufficient to pay the same and that the additional one-fourth of one mill special tax, with the excess of the three-fourths mill pledged, will be ample to support and maintain said Junior College."

The sole issue before the court, as stated by counsel for plaintiff in their brief, is "whether or not the Ouachita Parish School Board had the right to so anticipate its revenues under the special tax, by borrowing money, pledging a portion of said tax and issuing certificates of indebtedness, to the extent and under the terms of payment as set forth in the ordinance of the School Board." They further say:

"It is readily admitted that there is an urgent need of said funds, for otherwise, the building now under construction will be subjected to the elements over a considerable length of time, and the School Board shall have to meet defaults under its various building, equipping and furnishing contracts."

The junior college district, comprising all of Ouachita parish, created by the school board under Act 173 of 1928, is a local political subdivision of the state of which the school board is the governing authority.

The school board is a body corporate in law, and, as the governing authority of said junior college district, possesses such powers and duties with reference thereto as are expressly conferred upon it by the statute under which the district was created and the general law creating school boards and fixing their powers and duties with reference to public schools and school districts generally. Act No. 100 of 1922, as amended by Act No. 19 of 1926.

In addition to the powers expressly granted, they have such additional powers as are necessarily and properly incident to the performance of their statutory duties.

Under Act 173 of 1928, pursuant to which this junior college district was created, the school board has express authority to levy special taxes in order to derive funds for constructing and maintaining the college. The funds derived from the collection of such special taxes do not and cannot go into the general school fund of the parish, but are reserved as a special fund set apart and dedicated for the exclusive purpose of establishing and maintaining the college, which will become, when established, part of the public school system of the state.

The general public school law (Act 100 of 1922, as amended by Act 19 of 1926), not only grants to school boards the power to establish public schools and to erect the necessary buildings, but makes it their duty to do so. Section 21 of the general law provides that:

"Buildings, additions to buildings, repairs, supplies, sites, and equipment may be provided out of the general funds."

But funds for such purposes may be provided otherwise than out of the general fund, for the act goes on:

"Communities desiring better facilities and longer sessions than can be provided by a distribution of the general funds giving equal sessions to all schools shall secure same by voting special taxes or obtaining funds from other sources than the current or general funds."

■ Public school buildings may therefore be erected and the schools supported and maintained with funds derived from either one of two sources, those derived from the general school fund of the parish or from special taxes levied pursuant to general or special statutes. The funds derived from special taxes do not become part of the general fund of the board, but must be kept separate and used for the specific purpose intended. When a special tax is voted to erect a public school building, the proceeds of such tax can be used for that and no other purpose.

The question and the only one presented for our consideration in this litigation is whether a school board may, when a special tax is voted to build a public schoolhouse, the tax to run through a series of years and to be collected year by year, anticipate the revenues to be derived from said tax, issue certificates of indebtedness based on said tax to be paid during the years in which such tax is collected, and pledge the tax for the payment of the certificates, in order to raise funds with which to erect the building.

It is plaintiff's contention that such cannot be done; that the only way by which the avails of a special building tax may be used prior to the collection of the taxes is to submit the proposition to the voters and ask for authority to issue negotiable bonds as provided in section 14 (a and b), art. 14, of the Constitution of 1921, which provides that:

"Municipal corporations, parishes and school * * * districts, hereinafter referred to as subdivisions of the state, may incur debt and issue negotiable bonds, when authorized by vote of a majority, in number and amount, of the property taxpayers * * * at an election held for that purpose * * * (b) except as otherwise herein expressly provided, no bonds shall be issued * * * by any school district for any purpose other than acquiring lands for building sites and playgrounds, and for purchasing, erecting, enlarging, or improving school buildings and teachers' homes, and acquiring the necessary equipment and furnishings therefor."

Subsection (j), sec. 14, art. 14, provides that:

"The Legislature may authorize the taxing officers of the State to impose and collect taxes required for the payment of the principal or interest of any bonded debt of any * * * school district."

At its extra session in 1921, held subsequent to the adoption of the Constitution of that year, the Legislature adopted Act 46 to carry into effect that portion of article 14 of the Constitution relating to the issuance of bonds by political subdivisions of the state, section 8 of which Act reads as follows:

"Section 8. School District Purposes.—The governing authorities of school districts, may incur debt and issue bonds of such districts for the following purposes, and none other, to-wit: acquiring lands for building sites and play grounds; purchasing, erecting, and improving school buildings and teachers' homes and acquiring the necessary equipment and furnishings therefore. The title to all such lands, buildings and improvements shall be in the public."

Section 35 of the same act provides that:

"It shall be the duty of the governing authority of any subdivision issuing bonds hereunder, *to impose and collect* annually in excess of all other taxes, *a tax on all the property subject to taxation* by the subdivision under the Constitution and Laws of Louisiana *sufficient in amount to pay the interest annually or semiannually, and the principal falling due each year.*" (Italics ours).

The above provisions of the Constitution and the act of the Legislature point out the sole and exclusive method by which school boards may issue negotiable bonds for the erection of public school buildings.

When funds for that purpose are sought under this particular article of the Constitution and the enabling act, the board must go to the taxpayers for authority to issue bonds.

■ But this is not the exclusive method by which funds for such purposes may be obtained.

Section 10, art. 10, of the Constitution of 1921 provides that:

"For the purpose of constructing or improving * * * school houses * * * or for the maintenance thereof, any political subdivision may levy taxes, in excess of the limitations otherwise fixed in this Constitution, not to exceed in any year five mills on the dollar for any one of said purposes, and not to exceed in any year twenty-five mills on the dollar, on any property, for all of said purposes; * * * provided, no special tax authorized by this section shall run for a longer period than ten years."

This provision of the Constitution makes no reference to the issuance of bonds and does not contemplate that any may be issued, but provides a separate and distinct method by which school boards may obtain additional funds for the erection of public school buildings and for the maintenance of the schools.

■ There is nothing in this article of the Constitution nor in Act 173 of 1928, the junior college law under which the tax in instant case was voted, which prohibits school boards from anticipating the revenues to be derived from the levy of such taxes or the pledging of them in advance of their collection in order to obtain funds with which to construct the buildings, nor is there anything to indicate that it was intended that the boards should postpone the erection of such buildings until sufficient funds for that purpose shall have been collected.

To postpone action looking toward the erection of the buildings until all the taxes are paid in would deprive the inhabitants of the school district from obtaining any immediate benefit of the tax, and would in all probability compel them to wait ten years or to the end of the tax-paying period before getting the benefit of the taxes which they had paid, which might and probably would mean that some of them would derive no benefit at all therefrom, for the reason that the children of school age when the tax was voted would all have passed beyond that age at the end of the period.

In the instant case, the taxpayers of Ouachita parish, in 1928, burdened their property with a tax debt which will amount in the aggregate to nearly $700,000 in aid of public education. They anticipated, of course, that their children who were of educable age at that time would reap the benefit of the improved educational facilities made possible by the voting of the tax. But they can not do so if the school board is prohibited from making use of the tax prior to its collection. Therefore, unless the school board has authority to anticipate the tax and borrow against

it, the very purpose of voting the tax is thwarted.

While the school board has no express authority to borrow against the tax and to pledge it, such authority is clearly implied, because such authority is necessarily incident to the powers expressly granted and is indispensable to the declared objects and purposes of the law. The board would be incapable of carrying out the purposes of the act and the purpose of voting the tax if it could not anticipate its revenues from that source. The lawmaker clearly intended, we think, that school boards should be permitted to exercise this authority.

The Constitution of 1921 was finally adopted on June 13 of that year. Subsequently, on July 6, the Attorney General, through one of his assistants, advised:

"That where an annual special tax of five mills for five years has been voted in a school district for the purpose of constructing and equipping a public school building and the contract has been awarded, notes may be given by the school board and the special tax pledged for their payment, provided the aggregate amount of the principal of the notes shall not exceed the actual cost of construction and equipment and the aggregate amount of the principal and interest of the notes shall not exceed the net avails of the tax."

Six months later, on January 18, 1922, the Attorney General again advised that he could see no objection to this procedure. These letters were both contained in his report to the Legislature, submitted in 1922. School boards have since then acted upon the Attorney General's advice to the knowledge of the members of the Legislature. As there have been five regular and several extra sessions since these letters were written and submitted, it is reasonable to assume that, if it had been considered unwise for school

boards to pursue the practice approved by the head of the Department of Justice, legislation to correct the practice would have been adopted.

The anticipation of the avails of a special school building tax voted to run for a series of years to be collected annually and the issuance of certificates of indebtedness to be paid annually from the tax as collected, and the pledging of the tax to secure the payment of the certificates, is not violative of section 32, Act 100 of 1922, as amended by Act 19 of 1926, where the aggregate amount of the certificates does not exceed the net avails of the tax and where the net proceeds of the tax collected each year are sufficient to pay the certificates, and all interest, as they mature.

That section of the statute provides that school boards shall not "permit its expenditures out of current revenues in any school year to exceed its receipts of current revenues for the same year * * * and prohibited from making budgets or expenditures for current expenses in excess of budget or probable revenues * * * the parish school board is hereby prohibited from authorizing loans in excess of budget or *probable revenues*." (Italics ours.)

It is clear from this enactment that school boards are not permitted to contract debts exceeding the amount of their revenues for any current year. In other words, they are not permitted to contract debts beyond their ability to pay and debts for which no provisions have been made.

The voting of a special tax for building purposes to run through a series of years and to be collected annually provides in advance a fixed, or, at least, a probable revenue for the board in each of the years during the period over which the tax is to run. This is a special fund dedicated for a special pur-

pose, a current fund for each year, with reference to which and against which the board may contract obligations payable only out of such revenue.

"It is generally held that a limitation upon municipal indebtedness is not violated by an obligation which is payable out of a special fund, if the municipality is not liable to pay the same out of its general funds should the special fund prove insufficient, and the transaction by which the indebtedness is incurred can not in any event deplete the general resources of the municipality." 19 R. C. L. 985, § 281.

"So also under a law forbidding a municipality to incur any liability for any purpose exceeding in any year the income and revenue thereof, it has been held that a contract running over a number of years, and which, in the aggregate, requires the payment of more money than will be in the municipal treasury during any one year, but under which the annual payments do not exceed the income in any year, is valid and enforceable." 19 R. C. L. 983, § 279.

It is admitted that, in accordance with Act 173 of 1928, the special tax is to be used for the sole purpose of establishing and maintaining the junior college, and the board "has no other source of revenue *and that three-fourths of one mill ordered pledged by the ordinance to secure the notes or certificates of indebtedness, with interest, will be more than sufficient to pay the same and that the additional one-fourth of one mill* special tax with the excess of the three-fourths mill pledged will be ample to support and maintain said Junior College." The general treasury of the board will therefore never be depleted by the payment of these certificates of indebtedness. (Italics ours.)

The proceeding taken by the board makes it perfectly clear that it did not intend by the issuance of these certificates and the borrowing of money to erect the building, to create a general outstanding indebtedness which it would be unconditionally obligated to pay out of its general revenues, but only to bind the board to the extent of its ability to pay from the revenues derived from the tax. These certificates are to be payable only out of the avails of the tax with reference to which they are to be issued, and the holders of them will be charged with legal notice that they are not unconditional obligations of the board.

The judgment appealed from is affirmed, with costs.

O'NIELL, C. J., is of the opinion that the school board has no authority to fund the special tax into bonds or other negotiable instruments, unless authorized by a vote of a majority in number and amount of the property taxpayers, as required by the Constitution, article 14, § 14 (a and b), which authority might have been obtained at the election at which the levy of the tax was authorized, or at any time thereafter, without much delay.