I iWOODARD, Judge.
|2The issue is whether the police jury of Acadia Parish exceeded its authority by entering into a contract that would allow out-of-parish waste to be disposed of at the parish landfill.

FACTS

In 1980, the municipalities within Acadia Parish were responsible for operating their own waste disposal facilities. At approximately the same time, the Louisiana Department of Natural Resources implemented new regulations, concerning waste disposal facilities, which none of the municipally owned waste disposal facilities could meet. Therefore, Acadia Parish was faced with a critical problem: Acadia Parish had no landfill in which to dispose of its solid waste. Therefore, the police jury of Acadia Parish, together with all incorporated municipalities within the parish, except for a portion of the city of Eunice, formed a committee in early 1980 to study solutions to the waste disposal problems of Acadia Parish. This led to the two tax proposals at issue in the case sub judice.
The committee’s solution was to seek legislation to form a special tax district for the purpose of solid waste collection and disposal for Acadia Parish’s solid waste. Accordingly, La.R.S. 33:2738.55 was born. It was passed by the House of Representatives and Senate and signed by the governor on July 1, 1980.
La.R.S. 33:2738.55 mandated that the police jury could implement the special tax only after it was approved by a majority of the voters in Acadia Parish. Further, Section C of the statute specifically stated: “The proceeds of the tax shall be dedicated solely for the purposes approved by the electorate-” [Emphasis Added.] A special tax election was held on November 2, 1982 for the approval of a one percent sales and use tax. The actual tax proposal that the citizens of *96 Acadia Parish approved stated that the funds from the special tax were “... to be dedicated and used for the purpose of paying the cost of constructing, acquiring, improving, maintaining and ^operating solid waste collection and disposal facilities for the District, including the payment of the cost of closing garbage dumps now owned or operated by the Parish and various municipalities located within the District....” [Emphasis Added.] The “District” referred to all incorporated municipalities within Acadia Parish, except for that part of the city of Eunice lying outside Acadia Parish.
In 1984, the Louisiana Department of Environmental Quality (DEQ) issued a solid waste standard permit to the police jury to construct and operate a landfill on a one hundred seventeen acre tract in western Acadia Parish, near Egan, Louisiana. The Egan landfill began operation in 1985. In April 1988, another special tax election was held, seeking electoral approval of the rededication and reallocation of the revenues derived from the special sales and use tax. The tax proposal that the voters approved stated, in pertinent part, that:
“Shall the Acadia Parish Sales District ... be authorized to rededicate and re-allocate the revenues derived from the one percent (1%) sales and use tax (the ‘Tax’) heretofore levied and now being collected in the District pursuant to an election held in the District on November 2, 1982, as follows:
1. In each fiscal year, there shall first be paid or set aside from said revenues, a sum sufficient to pay (a) the principal and interest on all indebtedness of the District incurred for solid waste purposes, (b) all costs, but not less than $1,850,000 annually for constructing, acquiring, improving, maintaining and operating solid waste collection and disposal facilities for the Parish, including the establishment and maintenance of an equipment reserve fund into which there shall be deposited $50,000 annually, and (c) the cost of maintaining an emergency clean-up fund of at least $100,000; and
2. Thereafter, the remainder of said revenues to be used for the purpose of constructing, improving and maintaining public roads and bridges in Acadia Parish;_” [Emphasis Added.]
UFrom 1985 until 1994, the police jury operated and managed the landfill with revenues generated from the special sales and use tax, and pursuant to the DEQ permit, only solid waste from Acadia Parish was disposed of at the landfill. The police jury also contracted with Browning-Ferris, Inc. (BFI) to collect the waste within the parish to bring to the landfill.
However, in June 1994, the police jury entered into an operating agreement with Waste Management of Louisiana, Inc. (Waste Management), whereby Waste Management would operate and manage the landfill for a term of twenty-five years. This agreement is the center of dispute in the case sub judice. It permitted Waste Management to seek permit modifications to change “the service area for acceptance of waste without respect to geographic origin.” Subsequently, upon request, DEQ approved a modification to the original permit to allow Waste Management to accept solid waste from all parishes within the state. Waste Management also agreed to pay the police jury royalties primarily from the fees it would collect from disposing of out-of-parish waste at the landfill. The police jury anticipated that it would receive $80-$100 million in royalties during the term of the agreement.
In anticipation of this dramatic increase in revenue, the police jury adopted resolutions authorizing the issuance of bonds and certificates of indebtedness for the construction and improvement of parish roads. In September 1994, it instituted a bond validation hearing in the Fifteenth Judicial District Court of Acadia Parish, pursuant to La.R.S. 13:5121 et seq., in which it sought to establish the legality and validity of (1) certain certificates of indebtedness of $1.2 million and (2) the landfill operating agreement with Waste Management, the source of payment for the certificates. All taxpayers, property owners and citizens of Acadia Parish, including nonresidents owning property or subject to taxation in the parish and all other persons | ¡Interested or affected in any way by the issuance of the bonds by the police jury, *97 were named as defendants and served in accordance with La.R.S. 13:5121, et seq., by publication in Bayne Independent, a parish-wide newspaper.
On November 10,1994, Save Acadia’s Water, Inc. (SAW), a local citizens’ group, the city of Crowley, and several Acadia Parish residents filed an answer to this bond validation hearing, alleging that the landfill operating agreement was void because it exceeded the authority granted to the police jury by the citizens of Acadia Parish pursuant to the 1982 and 1988 special tax propositions. These defendants also filed various motions and exceptions challenging the summary procedure being used by the police jury to obtain a declaration of the validity of the landfill operating agreement. The trial court permitted Waste Management to intervene as a party plaintiff in this proceeding.
Subsequent to the police jury’s institution of the bond validation hearing, there were also two separate lawsuits, filed in the Fifteenth Judicial District Court, regarding the validity of the landfill operating agreement.
On October 7, 1994, SAW, the city of Crowley, and Barton W. Freeland, Sr. filed suit against the police jury, its individual members in their official capacities, and Waste Management, alleging that the landfill operating agreement was void and requesting that the trial court permanently enjoin the police jury and Waste Management from carrying out the agreement. The trial court permitted BFI to intervene as a party plaintiff in this proceeding. In response to this lawsuit, the police jury and Waste Management filed (1) dilatory exceptions of vagueness and prematurity and (2) a peremptory exception of no cause of action on the grounds that the plaintiffs had failed to allege any facts to show that the police jury had exceeded its authority in allowing out-of-parish waste to be disposed of at the landfill.
|6On October 24, 1994, SAW, and several Acadia Parish residents filed a “Petition to Contest The Issuance of Bonds,” again alleging that the landfill operating agreement, which would be a source of revenue to pay the bonds, was void. The police jury and its individual members, in their official capacities, were named as defendants in this particular lawsuit. In response, the police jury filed peremptory exceptions of no cause of action, no right of action, and prescription on the grounds that the plaintiffs had failed to file this suit under the provisions set forth in La.R.S. 13:5121 et seq.
On November 14, 1994, the three lawsuits were consolidated by the trial court, pursuant to a stipulation by counsel for all parties to this litigation. Approximately one month later, a hearing was held on all pending motions and exceptions filed in the consolidated cases. The trial court denied them.
These three consolidated cases were set for trial on the merits on January 24, 1995. At the beginning of the trial, the trial court found that the common issue in all of the cases involved the authority of the police jury, via the two tax propositions, to import out-of-parish waste to the landfill. The trial court then heard evidence on this issue and relegated the other issues to further proceedings, in the event that the initial question would not be dispositive of the case. The police jury and Waste Management objected to this decision, but the trial court overruled their objections.
After hearing the evidence, the court, in rendering its decision, noted that the two tax propositions did not specifically authorize or prohibit out-of-parish waste from being disposed of at the landfill. The trial court, using La.R.S. 39:704 as its basic guide, adopted a strict interpretation of the two tax proposals and ruled that the police jury had exceeded its authority in the landfill operating agreement only to the extent that it permitted out-of-parish waste to be disposed of at the landfill. The trial court also ruled that all other issues were moot, except for some particular issues in |7the original bond validation proceeding and issued a permanent injunction prohibiting the disposal of out-of-parish waste at the landfill. However, it stayed the injunction for ten days while the police jury and Waste Management filed writ applications to this court. We granted the writ, continued the stay of the injunctive relief, and ordered the Clerk of Acadia Parish to forward the transcripts of the foregoing proceedings.
*98 In their writ application, the police jury and Waste Management asserted four assignments of error. However, both parties have specifically admitted at oral argument that the relief they actually request from this court, in exercise of our supervisory powers, is to (1) reverse the trial court’s ruling that the police jury exceeded its authority by allowing the importation of out-of-parish waste to the landfill; (2) dissolve the permanent injunction; (3) dismiss all claims filed by SAW and the others; and (4) remand the case to the trial court to complete the bond validation hearing. Since the issue of whether the police jury exceeded its authority is dispositive of the case sub judice, we will address that issue.

LAW

The police jury argues that the special tax proposals give it the authority to enter into a contract to allow for the disposal of out-of-parish waste at the Egan landfill. It admits, however, that the tax proposals themselves are silent regarding whether out-of-parish waste can be disposed of at the landfill. It asserts that the tax proposals must be read in connection with La.R.S. 33:4161 — 4163, which give the parish the general authority as a taxing district to construct a “revenue producing utility” and to “sell” the “service” of the utility without respect to parish boundaries. The police jury insists that when these statutes and tax proposals are read together, it has the authority to “sell” the services of the landfill to other parishes who need to dispose of their solid waste.
IgSAW and the others, on the other hand, do not dispute that the police jury has the authority under La.R.S. 33:4161-4163 to build a landfill and dispose of out-of-parish waste there for a fee to produce revenue for the parish. However, SAW asserts that the Egan landfill was funded through a special tax; therefore, the police jury was authorized to exercise only the powers explicitly stated in the tax proposals. Thus, according to SAW, since the tax proposals are silent concerning out-of-parish waste, the taxpayers have not given any authority to the police jury to dispose of out-of-parish waste at the landfill constructed from a special tax. We agree.
Spending pursuant to a special tax is governed by La.R.S. 39:704, which provides, in pertinent part, that “The proceeds of any special tax shall constitute a trust fund to be used exclusively for the objects and purposes for which the tax was levied.” [Emphasis Added.] Further, under the well established jurisprudence of this state, special taxes are strictly construed. Hemler v. Richland Parish School Board, 142 La. 133, 76 So. 585 (1917). See also Watkins v. Quachita Parish School Board, 173 La. 259, 136 So. 591 (1931); Hodnett v. Monroe City School Board, 270 So.2d 598 (La.App. 2 Cir.1972); Brock v. St. James Parish Council, 407 So.2d 1265 (La.App. 4 Cir.1981), writ denied, 412 So.2d 1094 (La.1982). In Hemler, 76 So. at 587, the supreme court specifically held that:
“It is [a] familiar principle that laws authorizing taxation ... are in derogation of common right; and therefore to be strictly construed. And this is especially true of laws authorizing special taxes. If, therefore, among the enumerated purposes for which a certain special tax is authorized to be levied, a certain particular purpose is not mentioned, the conclusion is inevitable that for this unnamed purpose the tax may not be levied.”
The police jury attempts to get around Hemler by arguing that when the tax proposals were passed, it already had the authority under the 1984 DEQ solid waste permit and La.R.S. 33:4161 — 4163 to build a landfill and to dispose of out-of-parish waste for a fee to create revenue for the parish. It then asserts that the taxpayers’ | ignorance of the law is no excuse for permitting one to avoid its application, and consequently, the citizens of Acadia Parish should have known that the police jury possesses this general power, and they should be presumed to have authorized the police jury to take any action regarding the landfill.
Regarding the DEQ permit, the police jury attempted to reserve a right to collect out-of-parish waste for a fee in its 1984 DEQ permit application. However, DEQ rejected that request when it issued the 1984 permit. In *99 stead, DEQ granted the police jury the authority to receive solid waste only from Acadia Parish. In fact, after the police jury and Waste Management entered into the landfill operating agreement in 1994, the police jury again requested permission from DEQ to modify the original permit so that solid waste, regardless of geographic origin, could be accepted at the Egan landfill. If it had the authority, as it so argues, why would it need to request this modification? The fact is that when the citizens of Acadia Parish approved the 1988 special tax proposal, the police jury did not have the authority under any DEQ permit to accept out-of-parish waste at the landfill. Thus, it cannot argue that the taxpayers were ignorant of the alleged “law” of the permit.
Further, the police jury might have been correct that it had the general statutory authority, under La.R.S. 33:4161 — 4163, to do what it now seeks to do, had it taken the money to build and operate the landfill from its general fund, instead of requesting, from the citizens of Acadia Parish, through a special tax, additional funds to build and operate the landfill or if there were no specific statute governing special taxes. “Where one provision of a ... statute deals with a subject in general terms, and another deals with the same subject in a more detailed way, the two should be harmonized if possible, but if there is any conflict, the latter will prevail.” Arata v. Louisiana Stadium and Exposition District, 254 La. 579, 225 So.2d 362, 372 (1969), cert. den., 396 U.S. 279, 90 S.Ct. 569, 24 L.Ed.2d 467 (1970). Thus, La.R.S. 39:704, and not La.R.S. 33:4161-4163, is controlling in the case sub judice.
In determining the mandates of a special tax regulation, we also considered an Attorney General opinion interpreting the two tax proposals at issue, although it is only advisory and not binding on the court. See Roy v. Avoyelles Parish School Board, 552 So.2d 63 (La.App. 3 Cir.1989). In Atty.Gen. No. 94-346 (July 22, 1994), the Attorney General, Richard Ieyoub, opined that the importation of out-of-parish waste was not authorized by the tax propositions passed by the Acadia Parish voters. In reaching this conclusion, the Attorney General stated, in part, that:
“It has been consistently held by this office and the jurisprudence of the state that the scope of authority for the expenditure of sales tax revenues is concomitant to the consent of the electorate.” [Emphasis Added.]
All of our research indicates that the police jury clearly had a duty to enunciate with specificity all purposes for which the landfill would be used. If it had wanted to preserve its general statutory authority to collect out-of-parish waste for a fee, it should have specifically stated so in the tax proposals. The simplest, safest and most straight forward way it could have done it would have been to request “the right to collect waste from other parishes and to charge a fee for such disposal purposes.” In fact, that was the exact language it used in its 1984 permit application to DEQ. However, it did not make this request when it went to the citizens of Acadia Parish in the 1982 and 1988 special tax proposals.
The Police Jury Association of Louisiana, Inc., which was granted permission to file an amicus curiae brief in the case sub judice, tries to persuade that the trial court’s interpretation of “for the District” and “for the Parish” is incorrect by using analogies related to other public facilities where out-of-parish use is permitted. For example, it points out that tax proposals passed for building roads, parks, or libraries “for the parish” do not prohibit out-of-parish residents from using them; thus, neither | nshould the tax proposals in the case sub judice. However, this argument is flawed for many reasons.
First, we cannot consider these comparisons since the record is void of any evidence showing us the language of the their tax proposals. It is the language, stating the purposes for which the funds are to be used, which determines the police jury’s authority. Perhaps language existed in the proposals which permits the argued usage of the facilities.
Second, we do not believe that a landfill can be appropriately compared to ports, parks, museums, roads, libraries, markets, streets, or the like, for two very important reasons. While a landfill may share some *100 common characteristics with other “public” facilities, the trait which is unique to a landfill and defines its very nature raises health and safety issues for the citizens of the parish. Unlike other “public” facilities, a landfill is obnoxious in every sense of the word. Garbage is unsightly, smelly, attracts flies and rodents, and is a potential fire hazard. Shaw v. Township of Byram, 86 N.J.Super. 598, 207 A.2d 570 (App.Div.), certif. denied, 45 N.J. 35, 210 A.2d 780 (1965). Also, garbage is a prime source of disease and contamination. Id. “The legislature finds and declares that the disposal and utilization of solid waste is a matter of vital concern to all citizens of this state, and that the safety and welfare of the people of Louisiana require efficient and reasonable regulation of solid waste disposal practices_” La.R.S. 30:2152. No matter how carefully regulated, landfills present some hazard to the community, and that degree of hazard is directly related to the amount of garbage dumped. Shaw, supra. In the case sub judice, the estimated increase of waste to be dumped due to receiving out-of-parish waste is from 48,000 tons per year to 300,000 tons per year. This enormous increase, alone, will magnify the hazards the landfill presents to the health of Acadia Parish. Additionally, before the police jury’s contract with Waste Management, the landfill | i2was used primarily for residential solid waste. Now, Waste Management has requested permission from DEQ to modify the original permit to dispose of “non-hazardous” industrial waste.
Also, a landfill differs from other “public” facilities in that the landfill will be “used up.” If an out-of-parish resident drives on a parish road, or goes to a parish park or library, he or she does not deplete that asset. However, a landfill, by its very nature, is a limited asset in that every piece of garbage reduces the capacity of the landfill to accommodate other pieces. In the case sub judice, after the police jury’s contract with Waste Management, approximately eighty four percent (84%) of the solid waste that will be disposed of at the Egan landfill will be from other parishes. The increased usage will obviously drastically shorten its lifespan, leaving the people of Acadia Parish with the same critical problem they thought they were solving in the 1980’s, namely: a landfill to serve the needs of the parish, and once again, there will be potential health hazards resulting from lack of a receptacle for their own waste.
Additionally, if eighty four percent of the waste is from other parishes, how can it possibly be said that the landfill is constructed and operated “for the parish,” as mandated by the tax proposals? And finally, the tax proposals require that the police jury maintain a solid waste collection and disposal facility for the parish. “Maintain” means to preserve or retain. The American Heritage Dictionary of The English Language, New College Edition, 787 (1981). By decreasing the life of the Egan landfill and ultimately depleting it, the police jury in no conceivable way is “maintaining” the landfill as mandated.
We have been asked to consider the distinction of public and private domains regarding the classification of assets and to compartmentalize the landfill accordingly. We are urged that a political subdivision, such as the police jury of Acadia Parish, may own property within the public domain and private domain. See State Dept., Etc. v. City of New Orleans, 360 So.2d 624 (La.App. 4 Cir.), writ denied, 362 So.2d 1121 (La.1978). Public property owned in the public domain is accessible to all citizens, while property owned in the private domain may be used by certain groups of the public only. Id. In Landry v. Council of Parish of East Baton Rouge, 220 So.2d 795, 801 (La.App. 1 Cir.), writ refused, 254 La. 288, 223 So.2d 410 (1969), the first circuit explained this distinction as follows:
“Considering the applicable codal provisions and pertinent jurisprudence, it would appear that public property in the public domain envisions such publicly owned property and facilities as are open to the use of all peoples indiscriminately and without charge and which serve no quasi-commercial or proprietary purpose. Included in this classification are streets, public parks, public walks, libraries, public squares and museums.”
“On the other hand, publicly owned property or facilities which by their nature are *101 not open to use by the general public but are employed for the common good, such as public offices, police and fire stations, auditoriums and schoolhouses, would appear to fall within the classification of public property in the private domain. In this same order would be included publicly owned property of a quasi-proprietary or quasi-commercial nature such as public markets, airports and port facilities open to that segment of the public having need thereof and for whose use a fee or charge is levied.”
After conducting exhaustive research, we find that Landry and other similar cases, dealing with the issue of public and private domain, do not apply as there is no indication in any of them that the facilities being categorized were constructed pursuant to a special tax proposal, as in the landfill. Thus, in light of Hemler and Brock, supra, mandating special rules for facilities being constructed and operated with funds from special tax proposals, a comparison would be inappropriate, irrelevant, and unnecessary. Additionally, even if we were to make a comparison, for the previous reasons delineated, we find that a landfill does not fit into either of the Landry categories.

JuCONCLUSION

Under a strict construction of the tax proposals mandated by Hemler and La.R.S. 39:704, we can only conclude that the electorate gave the police jury the specific authority to dispose of only Acadia Parish waste at this landfill and not out-of-parish waste. Additionally, even though this finding is not necessary, the taxpayers obviously could not have known that they were giving carte blanche authority for this unnamed purpose when they approved the special tax proposals, and it would be presumptuous to assume that they would consider “another person’s junk to be their treasure.” The evolution of the special tax proposals makes the singular purpose of construction and operation of the landfill, which the taxpayers approved, crystal clear.
We find that the trial court did not err in its interpretation of the 1982 and 1988 special tax proposals. See International Harvester Credit Corporation v. I.T. Seale, 518 So.2d 1039, 1043 (La.1988).
For the foregoing reasons, the judgment of the trial court is affirmed. Further, it is Ordered, Adjudged, and Decreed that the stay order of the permanent injunction be dissolved. We remand this case to the trial court to decide any unresolved issues remaining in the bond validation hearing. Finally, costs are assessed against the police jury of Acadia Parish and Waste Management.

AFFIRMED AND REMANDED.

SAUNDERS, J., dissents and assigns written reasons.
DECUIR, J., dissents for reasons assigned by SAUNDERS, J.